## Scott v. First National Bank of Pikeville.

(Decided October 11, 1927.)

### Appeal from Pike Circuit Court.

1. Husband and Wife.—Under Ky. Stats., section 2127, wife becoming surety on husband's note is not liable unless her property is placed in lien for payment of debt.

2. Husband and Wife.—Wife executing note as loan to company principally owned by husband, to enable it to continue business, and giving husband full authority to negotiate it for her, held liable on such note, though no lien was placed on her property as provided in Ky. Stats., section 2127.

MOORE & CHILDRES for appellant.

JOHNSON, AUXIER & HINTON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Affirming.

The First National Bank of Pikeville sued Mrs. Rushia Scott on a note payable to it for $2,500, dated

October 30, 1925, executed by her, and indorsed by her and Frank R. Scott. Mrs. Scott defended on the ground that she was a married woman and had executed the note as surety for the Kentucky-Elkhorn Coal Corporation, without executing any mortgage or other writing as provided in section 2127, Ky. Statutes; the affirmative allegations of the answer being controverted by reply. For some reason not explained the suit was brought, heard, and tried in equity, though no complaint is made of this. Judgment was rendered for plaintiff for the amount of its claim, and defendant Rushia Scott appeals.

The record shows that the note sued on was executed in renewal of a similar note executed to the bank by the defendant, now appellant, on the 5th day of May, 1925. Frank R. Scott was president of the Kentucky-Elkhorn Coal Corporation and owned 75 per cent of its stock. He and his wife, Rushia, lived at that place, which is 25 miles distant from Pikeville. Mrs. Scott had never transacted any business with the bank, but the coal company did business with it, and owed it $12,500. After some prior negotiations, to be noted below, Frank Scott, on the 5th of May, 1925, mailed to the bank the original note, a check for the same amount drown by Mrs. Scott in favor of the coal corporation and indorsed by it, and a check drawn by the coal company in favor of the bank for interest on the note, all in one inclosure. These were received by the bank. The note was discounted and placed to the credit of Mrs. Scott on an account then opened. The check was also accepted and charged to that account and credited to the account of the coal company, and later this account was checked out by it in the regular course of business.

Leading up to this transaction, it appears that the coal company was indebted to the bank in the sum of $12,500, and a few days previous Frank Scott had applied to the president of the bank for an additional loan, which was declined on the ground that the company had exhausted its line of credit, and he was also informed that, as he had indorsed the company's paper, his credit was exhausted.

As to what then occurred, Frank Scott testifies:

"It was suggested that a loan might be arranged by handling it through some outside party, and the suggestion was made that my wife might accommodate the situation by coming in and relieving the coal

company's embarrassed situation, and a note was drawn up in favor of the bank for $2,500.''

He was asked, ''Did that suggestion come from the bank or from you? and answered. ''I think that Mr. Gray suggested that my wife make the note so the bank inspector could not object to the loan to the coal company.'' He further testified that he drew the check for $2,500, and carried both papers to her, which she signed, and which he mailed to the bank as above indicated, but that she was not otherwise concerned in the matter, and made nothing out of it.

Mrs. Scott testifies that Mr. Scott came to her at their home and presented the note and check, and told her that Mr. Gray would not let him have any more money and would not let the Kentucky-Elkhorn Coal Corporation have any more, but that she might get it for the Kentucky-Elkhorn Coal Corporation, and that she signed the note and check, but that she got no part of the proceeds and knew nothing further of the transaction except she understood that it was to be used in carrying on the business of the company and not in paying off its debts, and that the bank was unwilling to loan any money to her husband or the corporation, but would loan it to her.

''Q. And you authorized your husband, Frank R. Scott, to obtain this loan upon your credit? A. Yes, sir.

''Q. Do you deny or dispute in any way that you authorized your husband, Frank R. Scott, to act for you as your agent in this transaction with the bank? A. No, sir.

''Q. He was your full and duly authorized agent in this matter? A. Yes, sir.

''Q. You don't know what representation he made to the bank, do you? A. No, sir.''

Mr. Gray testifies that the bank was not soliciting loans; that Frank Scott came down and arranged for the loan to his wife, and denies positively that he made any suggestion to him of making such a loan. The coal corporation was owing the bank about $12,000 at that time, but no part of the proceeds of the note was credited on that indebtedness, which still exists in the same amount, although the coal company has gone into the hands of a receiver. The only benefit the bank received from the discount of the note was 6 per cent. interest.

Ordinarily it is hard for one to say "No" when asked by a friend to become his surety. When the opportunities and responsibilities of business life were bestowed upon married women, it was thought that in their inexperience they would be particularly susceptible to such pleas and especially so when the one seeking assistance was the husband or a member of the family. It was believed that, to require the surety's property to be placed in lien for the payment of the debt would cause such an one to hesitate and consider the matter before taking such action, and for their protection the act invalidates the suretyship unless this is done. This act has been given a liberal construction by the courts who do not permit its beneficient purpose to be frustrated by any subterfuge or artifice. And, whenever it appears that the real purpose of the transaction is to secure the debt of another, the statute is applied, regardless of the form of the paper which is executed. But, aside from this and some other exceptions not in point here, the statute recognizes the right of a married woman to borrow and loan money and to transact business generally, and, if she suffffers in so doing, she must abide the consequences. Here the coal company needed additional funds to carry on its business; both it and its president were indebted to the bank to the limit, though it does not appear that at that time either was insolvent. The bank declined to loan either any more funds. Perhaps it wished to see the coal company continue in business; perhaps not, though Mr. and Mrs. Scott were so interested and Mrs. Scott says she signed the note and checck for that purpose, and constituted her husband her agent with full authority to act for her in their disposition. He negotiated the note at the bank and had her check credited to that company's account, and it checked this out in the regular course of its business; no part of it being received by the bank except the interest discount, and it not being otherwise benefited. We may assume that the simultaneous receipt of Mrs. Scott's note and check gave notice to the bank that she was making the loan to the coal company. But, in the absence of evidence of an ulterior purpose on the part of the bank, we are unable to see how this made the coal company the debtor of the bank in the loan or imputed bad faith to the latter in discounting the note. Mrs. Scott had the undoubted right to borrow money and to make a loan to the coal company, as well as

to authorize her husband to act as her agent in the negotiation, and evidently this is what she intended to do. The case would have been different if any of the proceeds of the note had been applied by the bank to the debt due it, or if the facts showed that it was intended as a loan by the bank to the coal company and secured in this roundabout way. But no such facts appear. Suppose Mrs. Scott had failed, and the coal company had prospered, can it be said that the bank could have sued it in a direct action as principal? Or, if under the same circumstances the note and check had been executed by a man, would any one have thought of considering the coal company as principal and the only obligor on the note as a surety? We think not, and Mrs. Scott's status must be construed in the same way.

Such being the view of the chancellor, the judgment is affirmed.